# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

_____

GRAND ISLE GAMES, LLC,

        Plaintiff,

v.

THE ENTITIES, PARTNERSHIPS AND
UNINCORPORATED ASSOCIATIONS
LISTED ON SCHEDULE "A,"

        Defendants

_____

Case No. 3:25-cv-00390

Judge Aleta A. Trauger

## DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF LAW

Defendant No. 22 concertchop.com, Defendant No. 27 bamaxisboon.com (owned and operated by Larryhot Trading Co., Ltd.), Defendant No. 24 interestcen.com, Defendant No. 28 classupery.com, Defendant No. 29 beyonddraw.com (owned and operated by Mind E-Commerce Co., Limited), Defendant No. 25 repertoireof.com (owned and operated by Shenzhen Aaili Network Technology Co., Ltd.), Defendant No. 26 communicaten.com (owned and operated by Suzhou Ruoxing Network Technology Co., Ltd.), and Defendant No. 32 thrivenget.com (owned and operated by Nanchang Laifei Technology Co., Ltd.) (collectively "Defendants"), by and through their counsels, move for a dismissal of the action as to and against Defendants.

## PRELIMINARY STATEMENT

Plaintiff's lawsuit suffers from jurisdictional and pleading defects that require dismissal. First, Plaintiff failed to properly serve Defendants under the Hague Service Convention, the exclusive mechanism for serving Chinese entities. Email service—the method Plaintiff employed— is expressly prohibited under both Chinese law and the Convention. Without valid service, this Court lacks jurisdiction.

Second, even if service were proper, this Court cannot exercise personal jurisdiction over Defendants. Defendants have no sales whatsoever in Tennessee and therefore have not purposefully availed themselves of this forum.

Third, Plaintiff's claims themselves are fatally deficient. The complaint indiscriminately lumps 234 defendants together without distinguishing who allegedly did what, depriving Defendants of fair notice. In addition, for many of the Defendants, the only alleged conduct involves sales of generic "Crossword Solitaire" games with no use of Plaintiff's Q-Less® mark or any other allegedly similar mark. Such allegations cannot support federal trademark claims as they do not involve any registered trademarks.

Finally, Plaintiff's attempt to transform what is, at most, a routine online infringement

dispute into a sprawling civil RICO action highlights the overreach at the heart of this case. RICO is an extraordinary remedy, yet Plaintiff has not pled the existence of any enterprise, predicate acts, or concrete injury. Courts consistently reject such speculative efforts to recast ordinary commercial disputes as racketeering.

For these reasons, and as explained below, the Court should dismiss Plaintiff's claims in their entirety.

## I. THE CLAIMS AGAINST DEFENDANTS MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(B)(4)

Pursuant to Fed. R. Civ. P. 12(b)(4), an action must be dismissed if the service of process on the Defendants is insufficient.

Defendants were served by "electronic publication" or by "e-mail." (Ecf. No. 119-1).

Defendants are Chinese entities and China is a signatory to the Hague Convention. As such, service on Defendants must comply with the provision of the Hague Convention. By the plain language and structure of the Hague Convention, a form of service not explicitly permitted is barred unless agreed to by the subject country. China has not agreed to service via e-mail and therefore a Chinese entity cannot be served via e-mail.

*Alternatively*, Article 10 of the Hague Convention contains a provision which governs service via "postal channels." To the extent that service via e-mail *would be* allowed under the Hague Convention, the only applicable provision would be Article 10. However, China has expressly objected to permitting service in China via postal channels. Therefore, service via e-mail is not allowed in China even if it is allowed under Article 10 of the Hague Conventions generally.

Lastly, even if the Court takes the position that the Hague Convention does generally allow service by e-mail, service via e-mail is forbidden in China as China has expressly stated that service via e-mail is not allowed under Chinese law.

For these reasons, service of process on Defendants have not been sufficient and this action must be dismissed.

## A. Fed. R. Civ. P. 4(f)(1) Mandates that Service be Performed by "Internationally Agreed Means of Service"

Both China and the United States are "Contracting States" of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention").[1]

Therefore, service on a Defendant in China, in compliance with Fed. R. Civ. P. 4(f)(1), must be performed "by any internationally agreed means of service" and, therefore, must be in compliance with the Hague Convention.

Further, Fed. R. Civ. P. 4(f)(3) only permits service on a Defendant in China in a form "not prohibited by international agreement." Plaintiff's chosen form of service is prohibited by the Hague Convention unless the country in question permits it.

## B. The Hague Convention Does Not Allow for Service by E-Mail Unless the Country in Question Permits It

The language and structure of the Hague Convention outlines a number of specific methods of service which are expressly permitted and creates a system that allows countries to voluntarily agree to certain other additional means of service.

Article 2 of the Hague Convention requires each State to designate a Central Authority; Article 3 requires the competent authority to forward requests without legalisation; Article 5 requires the Central Authority to serve documents by lawful or requested methods; Article 8 allows service abroad through diplomatic or consular agents, subject to objection; Article 9 permits States to use consular channels, or in exceptional cases diplomatic channels, to forward documents for service;

---

[1] *See* https://www.usmarshals.gov/what-we-do/service-of-process/civil-process/hague-convention-service-abroad.

Article 10 allows, if the destination State does not object, service by post or direct service through competent persons in the destination State; Article 11 permits Contracting States to agree on alternative channels of transmission for service; Article 14 provides that service difficulties are resolved through diplomatic channels; Article 19 states the Convention does not override domestic law allowing additional service methods. *See* https://www.hcch.net/en/instruments/specialised-sections/service.

The plain texts of the Hague Convention make it very clear how the Hague Convention is structured. First, the authorized method of service of process is specified under Article 5 by service through a "Central Authority" designated pursuant to Article 3 in each "Contracting State."[2]

Second, each "Contracting State" is only permitted to allow additional methods of service upon parties located in other Contracting States as specified under Article 8 (service through diplomatic and consular agents), Article 9 (service through consular channels), Article 10 (service through postal channels and judicial officers), and Article 11 (other methods of service mutually agreed upon) if the other Contracting State has opted in or otherwise does not opt out of the Articles. *See Water Splash, Inc. v. Menon*, 581 U.S. 271, 275–76, 137 S. Ct. 1504, 1508 (2017); *see Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1392 (S.D.N.Y. 2022); *see Facebook, Inc. v. 9 Xiu Network Shenzhen Tech. Co.*, 480 F. Supp. 3d 977, 980 (N.D. Cal. 2020).

Third, any difficulties in connection with the service of process must be "settled through diplomatic channels" pursuant to Article 14.

Fourth, Article 19 allows a "Contracting State" the option to unilaterally permit additional

---

[2] *See Water Splash, Inc. v. Menon*, 581 U.S. 271, 275, 137 S. Ct. 1504, 1508 (2017) (finding that "[t]he primary innovation of the Hague Service Convention…is that it "requires each state to establish a central authority to receive requests for service of documents from other countries"); *see Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1392 (S.D.N.Y. 2022).

methods of service of process "coming from abroad," but no Article allows any "Contracting State" the option to unilaterally permit additional methods of service of process "going abroad." *See Facebook, Inc. v. 9 Xiu Network Shenzhen Tech. Co.*, 480 F. Supp. 3d 977, 980 (N.D. Cal. 2020).

Accordingly, the only "other means" of service of process "not prohibited by [the Hague Convention]" that a court may permit R. Civ. P. 4(f)(3) are the means of service allowed under Article 8, Article 9, Article 10, Article 11 and Article 19 *if the other Contracting State has opted in or otherwise not opted out of that Article*.

The Hague Convention is *not* drafted in a way to allow all possible methods of service by default, and then "prohibit" methods of service articulated in Articles 8, 9, 10, 11, and 19 when a Contracting State objected to that article.

Rather the Hague Convention is drafted such that email service is prohibited *unless* the Country in question permits it under Article 11.

## C. Courts in the United States May Not Permit Service in a Manner Inconsistent with Federal Treaty

To the extent that Plaintiff argues that service via email is permitted under Fed. R. Civ. P. 4(f)(3), Rule 4 cannot authorize service of process in "a manner inconsistent with a federal treaty." *Harris v. Browning-Ferris Industries Chemical Services, Inc.*, 100 F.R.D. 775, 777–78 (M.D. La. 1984) (explaining that "[b]ecause the Hague Convention is specific as to how service is to be made in a foreign country and the Federal Rules are general and designed to cover all circumstances, the Court finds that the provisions of the Hague Convention must control the manner of service" in an action where the Hague Convention applies); *see Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1394 (S.D.N.Y. 2022) ("Articles 11 and 19 provide ready tools to permit countries to expressly permit service by email. And those articles would be largely superfluous if litigants could serve a party in another country merely by selecting a method that is not expressly listed in the Hague

Convention—there would be no need for articles that permit countries to agree to other methods of service, or to legislate to affirmatively authorize other methods of services.").

To the contrary, the organization of the Hague Convention is to designate specific methods of service that all "Contracting States" agreed to (Article 5) and then designate additional methods of service that the Contracting States may opt in and opt out (Articles 8 to 11). *See Facebook, Inc. v. 9 Xiu Network Shenzhen Tech. Co.*, 480 F. Supp. 3d 977, 983 (N.D. Cal. 2020) (explaining that "the Convention's structure…enumerates particular methods for serving documents abroad" and the Convention's text "states that the Convention 'shall apply in all cases…where there is occasion to transmit a…document for service abroad," and therefore "[t]he Convention…doesn't simply offer…options that plaintiffs can resort to or not at their discretion…[r]ather, **the Convention-delineated methods of service…are exclusive**") (emphasis added).

Therefore, by definition the Hague Convention prohibits all other methods of services not referenced.[3]

As China has *objected* to service via e-mail, it is therefore impermissible for a party located in China to be served via e-mail.

---

[3] *See e.g.*, *Water Splash, Inc. v. Menon*, 581 U.S. 271, 273, 137 S. Ct. 1504, 1507 (2017) docket number 1:23-cv-00612 (holding that "the Hague Service Convention specifies certain approved methods of service and 'pre-empts inconsistent methods of service' wherever it applies");

*Kyjen Co., LLC v. Individuals*, 2023 U.S. Dist. LEXIS 16408, *6 (S.D.N.Y. 2023) (stating that "[o]mission of a particular method of service from the Convention cannot be read to implicitly authorize that method");

*see Luxottica Group S.p.A. v. P'ships & Unincorporated Ass'n* Identified *on Schedule "A"*, 391 F. Supp. 3d 816, 825 (N.D. Il. 2019) (*citing Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699, 108 S. Ct. 2104, 2107–08 (1988) ("**The Supreme Court has stated that the drafters of the Hague Service Convention intended to prohibit a method of service not mentioned in its text**") (emphasis added);

*see Night Owl SP, LLC v. Dongguan Auhua Elecs. Co.*, 2019 U.S. Dist. LEXIS 178264, *3 (M.D. Fla. 2019) docket number 2:2019cv00109 (concluding that "the Hague Convention's silence on a method of service does not make it permissible").

**D.  China has Objected to Service via Postal Channels which Extends to E-Mails**

In addition, not only has China *not* consented to service via e-mail China has *specifically objected* to service via e-mail through its objections to service via postal channels.

As mentioned, Article 10 of the Hague Convention allows for service "by postal channels" so long as the "State of destination does not object." China has opted out of Section (a) of Article 10 by filing an objection. See https://www.usmarshals.gov/what-we-do/service-of-process/civil-process/hague-convention-service-abroad.

Consequently, there are many well-reasoned precedents across districts holding that therefore service in China via e-mail is prohibited.

In *Luxottica Group S.p.A. v. P'ships & Unincorporated Ass'n Identified on Schedule "A"*, 391 F. Supp. 3d 816 (N.D. Ill. 2019), the plaintiff commenced a Schedule A case alleging trademark infringement against several Chinese entities. As the court held in that case, "[b]ecause email would bypass the methods of service the Hague Convention authorizes, the Convention preempts it as inconsistent." However, in addition, the Court also held that "Courts generally approach the problem of email service through the prism of Article 10(a)," that China has objected to service via postal channels, and therefore "China's objections likewise preclude email service." For this reason, the court held that service upon the Chinese Defendants was improper as it was done via e-mail.

Likewise in *Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1386, 1393 (S.D.N.Y. 2022), the plaintiff was a "global entertainment company" that brought infringement actions against a number of companies including Defendants located in China. The District Court explained in detail that many courts have held "Articles 11 and 19 of the Convention provide some support to the wholesale preclusion of email as a method of service." The District Court also noted that it "need not determine" whether the Hague Convention precludes e-mail entirely because *in addition*, China has objected to service via postal channels and therefore this "necessarily encompass an objection to

8

service via email."

The District Court in *Smart Study* cited to "[r]ecent guidance posted by Supreme People's Court of China" which left "little doubt that China's objection to service by mail would encapsulate service by email." Specifically Article 11 of the Minutes of the National Symposium on Foreign-related Commercial and Maritime Trial Work, which provided guidance for Chinese courts serving litigants outside of China, stated: "In the event that the country where the person to be served is located is a member state of the Hague Service Convention and objects to the service by mail under the Convention, it shall be presumed that the country does not allow electronic service, and the people's court shall not adopt electronic service." *Id.* at 1395.

### E. China has Explicitly Stated that Its Objection to Postal Service Extends to Service via E-Mail

Furthermore, China has explicitly stated its objection to postal service extends to service via e-mail, meaning that service via e-mail is not service by other means "not prohibited by international agreement" under Fed. R. Civ. P. 4(f)(3).

As noted in *Smart Study*, guidance posted by Supreme People's Court of China left "little doubt that China's objection to service by mail would encapsulate service by email."

In addition, attached as **Exhibit A** is a notice from the Ministry of Justice of the People's Republic of China, dated March 21, 2025, stating that: "According to China's Civil Procedure Law, a foreign judicial body or individual cannot directly serve documents to a person within China. Such requests should be submitted through the channels specified by treaties or through diplomatic channels, to the Ministry of Justice or the Ministry of Foreign Affairs, for the People's Court of China to serve on their behalf. When China joined the Hague Service Convention, it reserved the right under Article 10, which prohibits serving documents by mail within its territory. **Service by mail includes traditional mail, courier, email, fax, and other methods**."

9

Therefore even if the Hague Convention was that any method of service is permitted unless specifically objected to, Exhibit A confirms that China has specifically objected to service by postal channels and has explicitly stated that such objection also encompass service via e-mail.

### F. Many District Courts Have Addressed the Subject at Length, Holding that E-Mail Service is Not Permitted in China

To Defendants' knowledge, no court of appeals has directly addressed this legal question, including the Sixth Circuit.

But many District Courts have issued decisions extensively analyzing this matter.[4] These

---

[4] *See e.g.*, *Sales v. Guangdong Chigo Heating & Ventilation Equip. Co.*, 494 F. Supp. 3d 404, 417 (N.D. Tex. 2020) (holding that e-mail service is "proscribed by the [Hague] Convention because it is inconsistent with the Convention's authorized service methods");

*Topstone Commc'ns, Inc. v. Xu*, 603 F. Supp. 3d 493, 500 (S.D. Tex. 2022) ("This Court therefore determines that email service is not permitted under the Convention because it is inconsistent with and not authorized by the Convention's delineated service methods.");

*James Avery Craftsman, Inc. v. Sam Moon Trading Enters.*, No. SA-16-cv-00463-OLG, 2018 U.S. Dist. LEXIS 219083, at *18 (W.D. Tex. 2018) ("For similar reasons, this Court has significant doubts that any form of email service should have been permitted at the time of Plaintiff's Motion for Alternate Service, and Mascot's failure to return the waiver of service does not alone justify resorting to service by email.");

*Xianfeng Wang v. P'ships & Unincorporated Organizations in Schedule A*, No. 8:23-cv-2787-VMC-AAS, 2024 U.S. Dist. LEXIS 191419, at *8 (M.D. Fla. Oct. 22, 2024) ("In short, service by email upon the China-based Defendants is prohibited by the Hague Convention. Thus, email service is not proper here under Rule 4(f).");

*Kyjen Co., LLC v. Individuals*, 2023 U.S. Dist. LEXIS 16408, *6–7 (S.D.N.Y. 2023) docket number 1:23-cv-00612 (holding that "service via email and online publication is prohibited by [the Hague Convention and is impermissible under Rule 4(f)(3)");

*Schluter Sys., L.P. v. Sanven Corp.*, 2023 U.S. Dist. LEXIS 3069, *19 (N.D.N.Y. 2023) docket number 8:22-CV-155 (holding that "[a]s this Court has determined that the Hague Convention does not permit service by email on Chinese Foreign Nationals, email service is barred by Rule4(f)(4) because it is 'prohibited by international agreement'");

*Safavieh Intl, LLC v. Chengdu Junsen Fengrui Tech. Co.*, 2023 U.S. Dist. LEXIS 102843, *11 (S.D.N.Y. 2023) docket number 1:23-cv-03960 (concluding that "*Smart Study* offers the correct interpretation of the Hague Convention in light of recent Supreme Court precedent," *i.e.*, that service of process by email is prohibited under the Hague Convention);

cases are all consistent with Exhibit A, in which China explicitly stated that its objection to service by postal channels extends to service via e-mail.

### G. The Court's Prior Decision on Plaintiff's *ex parte* Application was Determined Without Benefit of Opposition

Plaintiff's original Motion to permit service via email was supported by Plaintiff's alleged urgency and practicality, but failed to provide the Court the relevant law necessary to support the Court's Order (ECF Nos. 11, 17). Defendants' motion herein provides that necessary legal background omitted by Plaintiff's Motion. This legal background (consisting of treaties, Federal Rules, and precedent) explicitly rejects Plaintiff's attempts to serve via e-mail.. Now, with the opportunity for full briefing by both parties, the Court is in a better position to assess the propriety of alternative service in light of the applicable legal standards and the specific facts of this case.[5]

At the time of Plaintiff's *ex parte* motion, the Court did not have the benefit of briefing on the relevant legal authorities, including binding international treaties. Instead, the application was supported solely by Plaintiff's unopposed assertions of urgency and practicality, along with a

---

*Smart Study Co. v. Acuteye-US*, 620 F. Supp. 3d 1382, 1392 (S.D.N.Y. 2022) (holding that "service by email on defendants located in China is not permitted under the Hague Convention");

*Facebook, Inc. v. 9 Xiu Network Shenzhen Tech. Co.*, 480 F. Supp. 3d 977, 987 (N.D. Cal. 2020) (holding that "service by email on the China-based defendants…cannot be authorized under Rule 4(f)(3)");

*Night Owl SP, LLC v. Dongguan Auhua Elecs. Co.*, 2019 U.S. Dist. LEXIS 178264, *4 (M.D. Fla. 2019) docket number 2:2019cv00109 (holding that "although [the plaintiff] has shown that emails to the identified email addresses are likely to provide actual notice, they are improper methods of service" under the Hague Convention and therefore impermissible under Fed. R. Civ. P. 4(f)(3));

*CRS Recovery, Inc. v. Laxton*, 2008 U.S. Dist. LEXIS 137363, 2008 WL 11383537, at *4 (N.D. Cal. Jan. 8, 2008) (concluding that "[a]n order allowing email service on a defendant located in China would contravene the treaty, and is not permitted under Rule 4(f)(3)").

[5] *See, e.g., Luxottica Group S.p.A. v. Partnerships & Unincorporated Ass'ns Identified on Schedule "A"*, 391 F. Supp. 3d 816, 827–28 (N.D. Ill. 2019) (granting defendants' motion to dismiss based on improper e-mail service under the Hague Convention, even though the court had previously authorized such service ex parte, explaining that the earlier order "does not withstand scrutiny under full adversary briefing").

11

substantial list of 234 defendants for whom Plaintiff sought e-mail service.

Practicality does not override legal requirements. Although many litigants may prefer to serve defendants electronically for reasons of efficiency, such preferences cannot displace established rules—particularly where international law is implicated.

"[C]ompliance with the [Hague] Convention is mandatory in all cases to which it applies." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 705, (1988); *see also Cisco Sys. v. Lamination Serv.*, No. 2:21-cv-02139-TLP-tmp, 2021 U.S. Dist. LEXIS 96901, at *3–4 (W.D. Tenn. May 21, 2021); *Sparrow Capital, LLC v. Katcharian*, No. 11-cv-34-WOB, 2013 U.S. Dist. LEXIS 200093, at *22 (E.D. Ky. Sep. 13, 2013).

As discussed above, both China and the United States are signatories to the Hague Service Convention, which governs service of process in cross-border litigation. Under that framework, a court in one signatory country may exercise jurisdiction over a person in another signatory country only if service complies with the Convention's requirements. The Convention allows participating countries to object to certain forms of service, and China has expressly objected to service by e-mail. (See Exhibit A.)

Just as a Chinese court may not unilaterally determine the sufficiency of service under American law, American courts are likewise bound by the limitations of international treaties in cases involving foreign defendants. Respect for these treaty obligations ensures reciprocal recognition and enforcement of judicial proceedings across jurisdictions.

Having now been provided the legal framework, not just Plaintiff's preferences, Defendants respectfully requests that the Court consider its motion under Fed. R. Civ P. 12(b)(4) and grant dismissal accordingly.

### H.  Plaintiff did not Perform a "Diligent Search" Prior to Seeking Alternative Service

Defendants anticipate that Plaintiff will take the position that the Hague Convention does not

apply because Defendants' addresses were "not known" at the time Plaintiff attempted to circumvent the Hague Convention.

"To determine whether an address is 'known,' courts have repeatedly looked to the efforts plaintiffs have put forth in attempting to discover said addresses. Particularly, before a plaintiff 'can circumvent the methods for service of process authorized by the Hague Convention, the plaintiff must put forth reasonable diligence in attempting to discover the defendant's address." *Robinson v. Turner*, No. 8:23-cv-626-SDM-SPF, 2024 U.S. Dist. LEXIS 27081, at *4 (M.D. Fla. Feb. 16, 2024) (cleaned up).

In the declaration of G. Edward Powell III, Mr. Powell attested that the *totality* of his attempts to discover defendant's addresses consisted of (a) viewing Defendants' websites and social media pages (ECF No. 140-1, ¶¶ 4–5); and (b) looking up Defendants' domain name registration information. (ECF No. 140-1, ¶6).

That is all.

Just looking up Defendants' websites and domain name registration info does not come close to the standard necessary for "reasonable diligence."[6]

---

[6] *See, e.g.*, *Progressive Southeastern Ins. Co. v. J & P Transp.*, No. 1:11-cv-137, 2011 U.S. Dist. LEXIS 73946, at *5–6 (N.D. Ind. July 8, 2011) (finding plaintiff used a private investigator to locate defendants, but because of plaintiff's failure to ask the private investigator to perform any follow-up work after the initial attempted service through the Canadian Central Authority failed, plaintiff's attempts were not reasonably diligent);

*see also Opella v. Rullan,* No. 10-21134-CIV-JORDAN/MCALILEY, 2011 U.S. Dist. LEXIS 69634 (S.D. Fla. June 29, 2011) (holding that, because plaintiff did not personally check the voter registration records of Mexico, the drivers' license registration records or the utility company records in an effort to locate defendant, plaintiff's efforts to search for defendant in only certain municipalities of Mexico did not constitute reasonable diligence, and thus defendant's address was not unknown);

*Jimena v. UBS AG Bank*, No. CV—F-07-367 OWW/SKO, 2010 U.S. Dist. LEXIS 57359 (E.D. Cal. June 10, 2010) (refusing to authorize substituted service because plaintiff provided no information regarding his efforts to ascertain defendant's address in Switzerland, had failed to conduct an appropriate investigation regarding defendant's address, and had not attempted to effect

It is Plaintiff's burden to establish that it made a reasonable investigation to ascertain Defendants' physical addresses. [7]

Plaintiff's declaration provides no evidence that Plaintiff attempted to hire a private investigator to look into Defendants' whereabouts. There is no evidence that Plaintiff reached out to Defendants at any point to inquire as to their address. Mr. Powell's declaration does not even state the date on which he viewed Defendants' websites and social media profiles.

Furthermore, in Plaintiff's Amended Complaint, it alleged that the RICO Defendants shared physical service address on registration documents (ECF No. 153, ¶49), demonstrating that

_____

service through the Hague Convention);

*c.f. Chanel, Inc. v. Xu*, No. 2:09-cv-02610-cgc, 2010 U.S. Dist. LEXIS 6734, at *3 (W.D. Tenn. Jan. 27, 2010) (determining the Hague Convention did not apply after plaintiff hired a private investigator in China who determined that the physical addresses provided by defendants did not identify street names, numerical street addresses or building numbers and that the addresses interchanged postal codes and sections for various cities, and who also conducted further searches of public databases and directories in China, unable to locate defendants, their addresses were unknown);

*RPost Holdings, Inc. v. Kagan*, No. 2:11-cv-238-JRG, 2012 U.S. Dist. LEXIS 7566, at *3–6 (E.D. Tex. Jan. 23, 2012) (granting substituted service on defendant only after plaintiff had attempted service through the Hague Convention on the address associated with defendant's online business website and had requested defendant's address from defendant's attorney and been refused);

*Malone v. Highway Star Logistics, Inc.*, No. 08-cv-01534-RPM—KLM, 2009 U.S. Dist. LEXIS 64024, at *5–6 (D. Co. July 13, 2009) (finding that defendant's addresses were unknown for the purposes of the Hague Convention after plaintiff's attempted service through the Hague Convention and through private process servers at defendants' various foreign addresses on their vehicle registration certificates, their vehicle liability insurance cards, and their drivers' licenses, as well as at the addresses provided by defendants, the court was satisfied that defendants' addresses were unknown).

[7] *Pyure Brands, LLC v. Nascent Health Sci. LLC*, No. 1:18-cv-23357-UU, 2019 U.S. Dist. LEXIS 227498, at *5 (S.D. Fla. Mar. 5, 2019) ("The applicable burden on a motion to dismiss for insufficient service of process under Rule 12(b)(5) is identical to that on a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2). … The burden-shifting framework established by the Eleventh Circuit for evaluating motions to dismiss for personal jurisdiction requires the plaintiff to produce competent evidence in support of his jurisdictional claims once the defendant has rebutted the jurisdictional allegations in the complaint.");

*Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'n Identified on Schedule "A"*, 391 F. Supp. 3d 816, 824–25 (N.D. Ill. 2019).

Plaintiff possessed this information but nevertheless chose to disregard it and pursue alternative service.Thus, Plaintiff has failed to meet their burden of demonstrating reasonable diligence in attempting to discover Defendants' address, and therefore, the Hague Convention applies.

## II.  THE CLAIMS AGAINST DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(B)(2)

Fed. R. Civ. P. 12(b)(2) allows for the dismissal of a complaint for lack of personal jurisdiction. "In the context of a Rule 12(b)(2) motion, a plaintiff bears the burden of establishing the existence of jurisdiction." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007).

The three requirements for the exercise of specific jurisdiction over the Defendants are: "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.* at 550.

The Defendants have *no* sales of any allegedly infringing goods and products in Tennessee.

As the Sixth Circuit has held, purposeful availment exists when a national business aimed at a nationwide audience has regular sales into a given forum. *AMB Media, LLC v. OneMB, LLC*, No. 23-5607, 2024 U.S. App. LEXIS 11277, at *12 (6th Cir. May 8, 2024). Here, none of the Defendants have had any sales in Tennessee. (ECF Nos. 129-2 to 129-6, ¶13) Therefore, this Court may not exercise specific jurisdiction as those Defendants have not purposefully availed themselves of the privilege of acting in Tennessee. *See, e.g.*, *See, Inc. v. Imago Eyewear Pty, Ltd.*, 167 F. App'x 518, 523 (6th Cir. 2006) (finding no personal jurisdiction upon presentation of evidence that all sales occurred outside of the United States); *Noco Co. v. Jasper Indus. Supply, Inc.*, No. 1:22-cv-00851,

2023 U.S. Dist. LEXIS 220445, at *12 (N.D. Ohio Dec. 12, 2023) (finding no personal jurisdiction where the "evidence shows that all of Jasper's sales of Noco products were to non-Ohio residents.").

### III.     PLAINTIFF HAS FAILED TO STATE A CLAIM DUE TO PLAINTIFF'S LUMPING TOGETHER THE ACTIONS OF ALL 234 DEFENDANTS

F. R. Civ. P. 8(a) requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The complaint must also provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *GS Holistic, LLC v. Wireless & Smoke LLC*, No. 1:23-cv-748, 2025 U.S. Dist. LEXIS 49752, at *9 (S.D. Ohio Mar. 18, 2025).

The Complaint lists *234 different defendants* under Schedule A. ECF. No. 32. The Complaint fails to provide any ability to discern or distinguish which factual claims apply to which of the 234 different defendants in this case. ECF No. 1. "By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [plaintiff's] complaint failed to satisfy this minimum standard." *Jackson v. Michigan*, No. 22-13150, 2023 U.S. Dist. LEXIS 233067, at *7 (E.D. Mich. Nov. 21, 2023). "A complaint that lumps all the defendants together and fails to distinguish their conduct, fails to give adequate notice to the defendants as to what they did wrong." *Aaron v. Durrani*, No. 1:13-cv-202, 2013 U.S. Dist. LEXIS 130510, at *11 (S.D. Ohio Sep. 12, 2013) (*cleaned up*).

For this reason, the Complaint fails to state a cause of action against Defendants. Defendants are entitled to know which specific facts of which specific counts apply to which of the specific Defendants.

### IV.     PLAINTIFF HAS FAILED TO PLEAD A CAUSE OF ACTION WITH RESPECT TO INFRINGEMENT FOR DEFENDANTS THAT SOLD "THE CROSSWORD SOLITAIRE GAME"

Plaintiff's claims at least as to and against some of the Defendants, appear to arise out of

Defendants' sale of the "Crossword Solitaire Game" and many of them sold products with images that *did not contain or use the "Q-Less" mark or any allegedly similar mark.* (ECF No. 14-1, 35). A party proves trademark infringement by showing that "the infringer used the mark in commerce." *AWGI, LLC v. Atlas Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021). If the defendant did not "use[] the mark in commerce," then there is no infringement. *Id.*

Defendant No. 24 for instance sold "The Crossword Solitaire Game," and there is no indication that the Defendant included the "Q-Less" mark in the Complaint. There is therefore no evidence of infringement in the Complaint.

Defendant No. 29 beyonddraw.com and Defendant No. 28, classupery.com also sold goods bearing the "Crossword Solitaire Game." (ECF No. 14-1, 37). Again, there is no indication that either of these defendants used Plaintiff's mark. There is therefore no evidence of infringement in the Complaint.

According to Plaintiff's ledger provided with Plaintiff's motion for injunctive relief, it appears that the only claims presented against Defendants Nos. 24, 28, and 29 are under Tennessee Common Law. (ECF No. 14, §3; ECF No. 14-1, 37). In other words, there are no federal claims against these Defendants. Therefore, the Court should decline to exercise supplemental jurisdiction and instead dismiss the state claims.

Defendant No. 25 repertoireof.com is owned by Shenzhen Aaili Network Technology Co., Ltd. Just as with Defendant No. 24, there does not seem to be any allegations that this Defendant used the "Q-Less" mark anywhere in their advertisements, and sold a product labeled as the "Crossword Solitaire Game" which is a description of the product. There is therefore no evidence of infringement in the Complaint.

Defendant No. 32 thrivenget.com is owned and operated by Nanchang Laifei Technology Co., Ltd. As with Defendant No. 29 and Defendant No. 28, Plaintiff only makes claims of unfair

competition against Defendant No. 32, without asserting any trademark infringement. In addition, Plaintiff's evidence only shows that Defendant No. 32 sold the "Crossword Solitaire Game" and the photo as used in advertising did not contain or exhibit the "Q-Less" mark. (ECF No. 14-1, 38). There is therefore no evidence of infringement in the Complaint.

For these reasons, the causes of actions for infringement under federal law should be dismissed as to and against Defendants No. 24, 25, 28, 29, and 32, and upon dismissal of the federal causes of actions, the Court should decline to exercise supplemental jurisdiction over the state law causes of action for unfair competition.

## V.      THE AMENDED COMPLAINT FAILS TO ALLEGE THE EXISTENCE OF AN ENTERPRISE

"A properly pled RICO claim must cogently allege activity that would show ongoing, coordinated behavior among the defendants that would constitute an association-in-fact." *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000) (cleaned up). "An 'association in fact' enterprise requires 'an ongoing organization, formal or informal,' with the various associates functioning as a 'continuing unit.'" *Shields v. UNUMProvident Corp.*, 415 F. App'x 686, 691 (6th Cir. 2011).

Here, Plaintiff has failed to allege the existence of an enterprise because they have failed to allege facts in support of any organizational structure at all, nor has Plaintiff "cogently allege[d]" coordinated behavior among Moving Defendants.

### A.  The Amended Complaint Fails to Allege Facts Showing Any Organizational Structure

"The hallmark of an enterprise is structure. . . . There must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable

18

to hierarchical or consensual decision-making. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise." *United States v. Johnson*, 430 F.3d 383, 391 (6th Cir. 2005) (quoting *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996)). Or to put it another way, there must be "(1) an ongoing organization with some sort of framework or superstructure for making and carrying out decisions; (2) that the members of the enterprise functioned as a continuing unit with established duties; and (3) that the enterprise was separate and distinct from the pattern of racketeering activity in which it engaged." *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 793 (6th Cir. 2012).

For instance, in *Perkins v. Wells Fargo Bank, N.A.*, No. 12-4284, 2014 U.S. App. LEXIS 5006, at *12-*13 (6th Cir. Mar. 12, 2014), the Sixth Circuit noted that plaintiffs "failed to state a RICO claim" because they failed to "adequately allege the existence of an enterprise" as they "did not describe the hierarchical structure of an enterprise, much less name the specific persons in the enterprises and their roles, or demonstrate that the enterprise functioned as a continuing unit."

Likewise in *Emmet v. Franco*, No. 16-cv-11211, 2016 U.S. Dist. LEXIS 109726 (E.D. Mich. Aug. 18, 2016), plaintiff sued a group of defendants who owned a number of different farm companies. Plaintiff alleged that these defendants solicited plaintiff for investment, representing that they owned legal marijuana warehouses. Plaintiff then claimed that he was the subject of a fraud and brought a RICO action against them. The District Court held that plaintiff failed "to plead any type of organizational structure that exists separate and apart from the pattern of wrongdoing." *Id.* at 16. The complaint in *Emmet* was also devoid of any details as to how the defendants listed were organized.

The Amended Complaint does not plead *any facts* with respect to the organizational structure of the enterprise. There is not one factual allegation as to the "framework or superstructure" of the enterprise. There is not one factual allegation about the organization and decision-making process of

19

the enterprise. There is not one factual allegation about when Moving Defendants joined the enterprise. There is not one factual allegation as to what the "established duties" or roles were for each of the Moving Defendants within the enterprise.

The Amended Complaint, in failing to make any factual allegations about the organizational structure itself, fails to plead the existence of an enterprise.

### B. The Amended Complaint's Allegations of Coordination Rely on Unwarranted Factual Inferences

In addition, the Amended Complaint fails to plead the existence of an enterprise because its allegations of "coordinated behavior" relies on unwarranted factual inferences.

The Amended Complaint alleges a number of superficial similarities between the Moving Defendants, i.e.:

1. A "similar look and feel" in the websites (ECF No. 153, ¶47);

2. Common PayPal Client IDs, but different Merchant IDs (ECF No. 153, ¶48);

3. Shared physical service address on registration documents (ECF No. 153, ¶49); and

4. Algorithmic email naming (ECF No. 153, ¶50).

These allegations all follow the same general pattern. Plaintiff alleges the existence of a similarity and then concludes that the similarity means coordination.

But on a Rule 12(b)(6) motion to dismiss, the court "need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Christian v. Altaire Pharm., Inc.*, No. 20-6360, 2021 U.S. App. LEXIS 23751, at *3 (6th Cir. Aug. 10, 2021).

For example, with respect to the "similarity in websites," the Amended Complaint alleges that the websites "exhibit a highly similar look and feel" because they employ "substantially identical font choices, design layouts, and overall aesthetic." Plaintiff then leaps to the factual inference that

this alleged "uniformity" indicated a "centralized design template or shared resources, reflecting a coordinated effort rather than independent actions." (ECF No. 153, ¶47).

None of these inferences are reasonable.

*Many* online business websites share "substantially identical font choices." Plaintiff alleges that the websites use the same fonts without identifying the fonts used, or which websites use which fonts. Plaintiff also does not allege that the specific font used is uncommon. Plaintiff also does not allege facts supporting the conclusion that Moving Defendants employ "substantially identical" design layouts. Nor does Plaintiff say what about Moving Defendants' websites' layouts are special or unique to Moving Defendants as opposed to again, any other company that does business online. The same with respect to "overall aesthetic" where again, Plaintiff does not allege any factual support for this conclusory statement.

Furthermore, even if the Court were to accept that Moving Defendants employed a highly similar look and feel in their websites, it is unwarranted to conclude that Moving Defendants coordinated their efforts to that end.

Plaintiff has alleged RICO against the Moving Defendants and Defendant Nanchang Yangfa Technology Co., Ltd. (ECF No. 153) The Complaint lists 234 different defendants under Schedule A. (ECF No. 32). Many of those defendants sold allegedly infringing goods on Amazon, Ebay, Temu, or other third-party platforms. But some of the defendants sold goods out of their own websites as Moving Defendants did. This includes Defendants No.: 8 (happyteesco.com), 20 (heyisail.com), 21 (flownwing.com), 31 (yoyocats.com), 111 (nowkhaz.com), 148 (fruugo.com), 159 (inspiredhousehold.com), 160 (awishday.com), 162 (dodorado.com), and 163 (infinitias.com). Plaintiff alleges that similar website design evinces a common enterprise but then turns around and excludes numerous websites with similar designs or layouts without explanation why *some* defendants with similar websites are coordinated while other defendants with similar websites are

not. Plaintiff cannot have it both ways.

Likewise, Plaintiff next alleges that Moving Defendants all share the same "PayPal client ID" but acknowledges that each store has their own individual and different "merchant IDs." This PayPal client ID does nothing more than suggest each of the websites uses a popular SaaS platform such as Shopify. PayPal client ID represents the ID of the SaaS service provider registered with PayPal.[8] From there, Plaintiff then jumps to the unwarranted factual inference of there being a central administration through a single PayPal Business or Partner account. Once again, this is wrong. According to PayPal itself, "Each PayPal account has a unique merchant account ID. When you create a payment button, you can choose to display your merchant account ID instead of your primary email address. This way your email address won't be visible to spammers."[9]

With respect to service address, Flat/RM 705, 7/F, Fa Yuen Comm Building is a Service Address used for businesses registered in Hong Kong (in the same way many American companies are registered in Delaware) that operate primarily in other location (Mainland China) and need a registered agent that is able to accept service of process on behalf of the company in Hong Kong. In the United States for instance, many companies registered in Delaware have 1209 Orange Street, Wilmington, DE 19801 as their registration address, as that is the registered agent address for CT Corporation in Delaware. Likewise, there are a large number of different unrelated Chinese companies that do the same with the Flat/RM 705, 7/F, Fa Yuen Comm Building address.[10]

Furthermore, Plaintiff alleges that Moving Defendants used email addresses that appear to be

---

[8] https://developer.paypal.com/api/rest/
[9] https://www.paypal.com/us/cshelp/article/how-do-i-find-my-secure-merchant-id-on-my-paypal-account-help538
[10] https://fcc.report/FCC-ID/2AYHE-2208D/6345669.pdf;
https://www.importyeti.com/supplier/kut-global; https://weetcl.com/Contact_Us/;
https://panjiva.com/Lanka-China-General-Trading-Co-Ltd-Flat-Rm/200442552;
https://www.ltddir.com/companies/topsun-marine-hk-co-limited/;

"algorithmically generated." From there, Plaintiff then jumps to the conclusion that as a result, there was a "unified operational approach across the enterprise." Plaintiff does not explain how one follows the other. In fact, as explained in the accompanying Moving Defendants' declarations, Moving Defendants named its PayPal accounts email address using letter combinations whose pronunciations resemble the Chinese pronunciation of the Company name. *See* Declaration of Moving Defendants, ¶12.

Lastly, Plaintiff alleges that the "total amount sent" of 0 in PayPal's account summary indicates the PayPal accounts function primarily as collection points. This inference is wrong. Moving Defendants typically withdraw the PayPal balance to a third-party payment platform, and then use that platform to pay service providers, instead of using PayPal to transfer funds directly to service providers. As a result, the PayPal account summary shows a total sent amount of zero. This method of handling payments is common and efficient for cross-border transactions and does not indicate that the PayPal account is used as a collection point for any improper purpose. *See* Declaration of Moving Defendant, ¶13.

Taken together, the Amended Complaint contains little in way of factual allegations but much in way of unwarranted factual inferences.

C. **The Amended Complaint Fails to Plead Predicate Acts for Each of the Moving Defendants**

To establish a "pattern of racketeering activity," Plaintiff must allege that Moving Defendants committed "at least two predicate offenses." *Am. BioCare Inc. v. Howard & Howard Attys. PLLC*, 702 F. App'x 416, 421 (6th Cir. 2017). Plaintiff must allege how "each Defendant participated in the affairs of the Alleged RICO Enterprise" and "each Defendant is entitled to an individualized analysis of his, her, or its own RICO liability." *Kerrigan v. Visalus, Inc.*, 112 F. Supp. 3d 580, 602-03 (E.D. Mich. 2015).

23

The Amended Complaint alleges "Criminal Copyright Infringement" and "Criminal Trademark Counterfeiting" as the predicate offenses.

For the "Criminal Copyright Infringement" predicate offence, the Amended Complaint alleges in a general fashion that "each RICO Defendant entity" allegedly "copied and utilized video content created by Q-Less® TikTok content affiliate Angela_lynn33 without authorization." (ECF No. 153, ¶55). The Amended Complaint *does not allege that this other video content was copyrighted*. Therefore, even accepting the allegations of the Amended Complaint as true, the Amended Complaint *does not allege that "each RICO Defendant entity" engaged in Criminal Copyright Infringement*. To establish a claim for copyright infringement, Plaintiff is required to show "ownership of a valid copyright." *Haowei Yang v. Shenzhen Hongfangrui Tech. Co.*, Civil Action No. 23-13001, 2025 U.S. Dist. LEXIS 64150, at *5 (E.D. Mich. Apr. 3, 2025). Thus, on its face, the Amended Complaint fails to allege *any* Criminal Copyright Infringement claims against Moving Defendants.

For the "Criminal Trademark Counterfeiting," the Amended Complaint states in a conclusory fashion that Moving Defendants "intentionally used Plaintiff's registered Q-Less® mark, or a colorable imitation thereof." (ECF No. 153, ¶59). The Court however is not required to accept Plaintiff's legal conclusions. Just a quick glance at the Amended Complaint shows that this is not the case. For example, the Amended Complaint shows Defendant No. 32, Thrivenget, selling "*The Crossword Solitaire Game*" using a photo *that does not contain the Q-Less® mark anywhere*. (ECF No. 153, 15). The same goes for Defendant No. 24 Interestcen and Defendant No. 25 Repertoireof. (ECF No. 153, 14).

Therefore the Amended Complaint fails to allege a pattern of racketeering activities because it fails to allege two predicate offenses against Moving Defendants.

24

## VI.    **THE AMENDED COMPLAINT FAILS TO PLEAD THE EXISTENCE OF INJURY TO BUSINESS AND PROPERTY**

"A civil RICO plaintiff must also show that (1) the defendant's RICO violation was a but for cause of the plaintiff's injury, and (2) that the RICO predicate act proximately caused the plaintiff's alleged injur[ies]." *Stallard v. Goldman Sachs Grp., Inc.*, Civil Action No. 20-2703 (RBW), 2024 U.S. Dist. LEXIS 215791, at *19 (D.D.C. Nov. 27, 2024) (cleaned up). "While the misuse of intellectual property can suffice to confer standing for a RICO claim, the plaintiff must provide a concrete example of the harm that was caused." *Id.* at *21-*22 (cleaned up).

In *Stallard*, plaintiff attempted to raise a RICO claim in relationship to defendant's alleged infringement of plaintiff's copyrights and trademark. The District Court, however, noted that "mere injury to an intangible property interest" is not enough to sustain an "injury" for purposes of civil RICO and dismissed the claim. *Id.* at *23 (cleaned up).

Similarly, in *McGillvary v. Scutari*, No. 23-cv-22605-JMY, 2024 U.S. Dist. LEXIS 231615, at *35-*36 (D.N.J. Dec. 23, 2024), plaintiff alleged that defendants willfully "copied, displayed, broadcast, and made derivative works" from Plaintiff's work without authorization for private financial gain in violation of Plaintiff's copyright in four works. However, the District Court held that "Plaintiff alleges no actual loss, and thus has no RICO standing, in connection with any alleged copyright infringement," holding that "[a]t best, Plaintiff's allegations are akin to a claim for lost profits, which are cognizable only if they are not remote or speculative and can be described with concreteness." *Id.* (cleaned up). The District Court also explicitly rejected legal fees, holding "legal fees in the RICO action cannot form the basis for RICO liability." *Id.* This makes sense as RICO has a fee shifting provision, which would make "injury" a moot requirement if the legal fees associated with the action can be used to constitute concrete injury.

Just as in those cases, the Amended Complaint also alleges only non-concrete injuries such as "lost sales, diminution of brand value, damage to goodwill and reputation, and substantial

expenses incurred in attempting to combat the defendant's illegal activities."

Not only does the Amended Complaint not allege concrete harm, it also fails the but for and proximate causation test. Here, Plaintiff has brought copyright and trademark infringement claims against *234* different defendants. Plaintiff does not allege that *any* of the (small handful of) buyers of the allegedly infringing goods would have purchased them from Plaintiff had they not purchased them from Moving Defendants. It is just as likely that they would have purchased it from someone else, including either one of the other 234 different defendants, or the many other merchants who also sell legal generic versions of Plaintiff's game as the Moving Defendants did in selling goods advertised as the "Crossword Solitaire Game," making no mention of the "Q-Less" mark.

For these reasons, the Amended Complaint fails to allege a concrete injury to Plaintiff's business, experienced but for Moving Defendants' allegedly infringing conduct.

## CONCLUSION

For the foregoing reasons, Plaintiff is unable to demonstrate personal jurisdiction or sufficient service of process to maintain this lawsuit against Defendants. Plaintiff has further failed to state a proper claim against Defendants, including a RICO claim. Defendants therefore respectfully request that the Court dismiss the case and grant other relief that is just and proper.

Dated: August 26, 2025

Respectfully submitted,

*/s/ Ryan D. Levy*
Ryan D. Levy (TN BPR #024568)
Patterson Intellectual Property Law, P.C.
1600 Division Street, Suite 500
Nashville, TN 37203
rdl@iplawgroup.com

-and-

*/s/ Jacob Chen*
Jacob Chen (*Pro Hac Vice*)
jchen@dgwllp.com
**DGW KRAMER LLP**
45 Rockefeller Plaza, 20th Floor,
New York, NY 10111

*Counsel for Defendant Defendant No. 22 concertchop.com, Defendant No. 27 bamaxisboon.com (owned and operated by Larryhot Trading Co., Ltd.), Defendant No. 24 interestcen.com, Defendant No. 28 classupery.com, Defendant No. 29 beyonddraw.com (owned and operated by Mind E-Commerce Co., Limited), Defendant No. 25 repertoireof.com (owned and operated by Shenzhen Aaili Network Technology Co., Ltd.), Defendant No. 26 communicaten.com (owned and operated by Suzhou Ruoxing Network Technology Co., Ltd.), and Defendant No. 32 thrivenget.com (owned and operated by Nanchang Laifei Technology Co., Ltd.)*

27

## CERTIFICATE OF SERVICE

On August 26, 2025, I filed the foregoing document with the clerk of court for the U.S. District Court, Middle District of Tennessee, using the CM/ECF System which will send notification of said filing to all counsel of record.

*/s/ Ryan Levy*
Ryan Levy

28